## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| ROBERT LEONARD, WILLIAM COOK, | ) | |
| DIANA WATERS, DAVID WEGENG | ) | |
| and ROGER FONATA | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | |
| | ) | |
| v. | ) | Case No. 05-1069 |
| | ) | |
| PHIL KATSINAS, | ) | |
| ROGER HUDDLESTON, ROUND BARN | ) | |
| RESTAURANT, INC., and the HONOR | ) | |
| THE CHIEF SOCIETY, INC., | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## ORDER

Now before the Court is Defendants Phil Katsinas and Round Barn Restaurant, Inc.'s

Motion for Summary Judgment [#102].  For the reasons set forth below, the Motion is DENIED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims

asserted in the Complaint present federal questions under 42 U.S.C. § 1981.

## BACKGROUND

Recently, on February 16, 2007, the University of Illinois at Champaign-Urbana ("U of I"

or "the University") announced its plan to retire its 81-year-old mascot, Chief Illiniwek.  Jodi S.

Cohen, *U of I Sets Last Dance for Illiniwek*, CHI. TRIB., Feb. 17, 2007, at 1.  The Chief,

portrayed by a barefoot student who dances during halftime of various University sporting events

in a buckskin costume and feather head dress, has been the subject of well-known debate for

decades.  *Supporters Defiant as Chief Illiniwek Makes Last Stand*, CHI. TRIB., Feb. 22, 2007, at

1

16.  February 21, 2007, marked the final performance of Chief Illiniwek, who supporters viewed as an honorable tradition and critics labeled as demeaning to Native Americans and inciting a hostile environment on campus.  *Id.*; Jodi Cohen, *U of I Ends Chief Illiniwek's Run*, CHI. TRIB., Feb. 16, 2007.  The University's decision came after more than 15 years of great controversy surrounding the mascot, including several campaigns to retain the Chief up against years of protests opposing the mascot.  *U of I Sets Last Dance, supra*.  The facts of this case arise out of one such protest, at the height of the Chief Illiniwek controversy.

Plaintiffs Tom Leonard ("Leonard"), William Cook ("Cook"), Diana Delso, f/k/a Diana Waters ("Delso"), David Wegeng ("Wegeng"), and Roger Fontana ("Fontana") have brought this action against Defendants Phil Katsinas ("Katsinas"), Roger Huddleston ("Huddleston"), Round Barn Restaurant, Inc. ("the Restaurant" or the "the Banquet Center"), and the Honor the Chief Society, alleging that their rights under 42 U.S.C. § 1981 were deprived when they were wrongfully denied entrance to the Restaurant's Banquet Center and an HTCS event being held there on February 28, 2004. They allege that the Defendants excluded them because of their Native American heritage

## I.  The Plaintiffs' Backgrounds

Cook, Leonard, Delso, Wegeng and Fontana all claim to be Native American and are all admittedly "anti-Chief."  Each has acted on his or her anti-Chief beliefs in the past.

### A. William Cook

Cook is the most "accomplished" and well-recognized of the Plaintiffs when it comes to participation in anti-Chief protests and reputation for being an influential member of the anti-Chief movement.  Cook first began protesting Chief Illiniwek in the early or mid-1990s, and estimates that he has participated in five to ten protests per year since then.  For example, he has

protested at sporting events, oftentimes shouting anti-Chief slogans, has held anti-Chief rallies, and has attended University Board of Trustee meetings, carrying anti-Chief banners. Cook also regularly writes into local newspapers and calls local radio stations to voice his anti-Chief plaintiff. He admits that his activities have also earned a lot of unsolicited coverage from the media and that he is fairly well-recognized in the community as being anti-Chief. People unknown to him have recognized and harassed him for his opposition to the Chief.

Cooks admits that he is purposefully disruptive and extreme in order to shock people and draw attention to his cause. Observers occasionally respond to his displays with violence. Cook has been physically attacked fist to face, regularly has objects thrown at him, and has been sworn and shouted at. Cook also testified that he has received many threats, including threats of injury and death. When Cook is anticipated to be present at University events, the University police are notified and officers are stationed nearby.

Perhaps the most notorious protest involving Cook occurred during a 2002 U of I women's basketball game. From the stands, Cook and another of the plaintiffs, David Wegeng, shouted profanity and anti-Chief slogans. Wegeng was ejected from the game for using offensive language, and Cook was also eventually told to leave by University security. When he refused, Cook began fighting off the officers and was ultimately handcuffed and escorted out of the arena while shouting. Because of the incident, Cook was tried and convicted of resisting a peace officer. The incident, trial, and conviction all received extensive media coverage.

Cook identifies himself as an "adopted Dakota" but has no Dakota blood and is not represented in any Dakota Nation documents as a tribe member. He insists that he is at least 1/32 Cherokee Indian. At times, he has described himself as an "assimilated Cherokee." He has no documentation and has asserted no other evidence other than his own testimony to establish

any Native American heritage, and acknowledges that the Bureau of Indian Affairs requires 1/8th Indian blood for one to be considered Native American. While Cook testified that people have told him that he looks Native American, others have testified that they believe Cook is Caucasian. Cook himself has admitted in media broadcasts that he looks mostly white.

### B. Tom Leonard

Of the five plaintiffs, Leonard is the only "card-carrying" Native American, so to speak. He has established his Native American heritage by producing his father's tribal enrollment card from the Saginaw Band. Leonard admitted that he has participated in multiple protests of Chief Illiniwek in the past with some of the other Plaintiffs, including protests at U of I sporting events, and has held anti-Chief signs at football games. He has also been pictured in media accounts of the events.

### C. Diana Delso

Delso alleges that she is of distant Cherokee ancestry, "generations ago" on her mother's side. While Delso alleges that she has always known she was Native American, she has always marked Caucasian or white when identifying her race on various documents. She also acknowledges that people would not know, just from her appearance, that she has Native American blood. She testified that she attended one anti-Chief protest before the incident at the Round Barn Restaurant and a few afterwards.

### D. David Wegeng

Wegeng alleges that he is part Lakota Indian, but does not know which of his ancestors was a full-blood Native American. He has no documents showing that he is Lakota, but estimates that there was a full-blooded Lakota Indian in his family tree about four or five generations ago. Wegeng has marked his race as Caucasian on various forms in the past, but

testified that his dark skin and dark eyes make him look Native American.  Several others have stated that there is not anything about Wegeng's appearance that would lead one to conclude that he was of Native American heritage.  He estimates that he has attended about a dozen anti-Chief protests at sporting events and Board of Trustees' meetings in the past.  He testified that the typical responses to these events include screaming, swearing, beer throwing, spitting, vandalism, and bodily violence.

### E. Roger Fontana

Fontana's adoptive parents told him that he had Native American ancestry, but he is unable to identify a particular percentage. He alleges that his father is one half Native American. Fontana also testified that the Cherokee Historical Society told him that his great-grandfather was full blooded Cherokee.  Fontana has participated in dozens of protests and has also provided security for these events to prevent attacks on anti-Chief people. Fontana has gone to Chief Illiniwek tryouts with Cook, and testified that people there recognized them as being anti-Chief and that Cook is well known as a result of his protests, especially the 2002 incident at the women's basketball game.

## II.  The Defendants

The Honor the Chief Society is a not-for-profit corporation.  Its purpose is to represent alumni, fans and various other constituencies that support the Chief Illiniwek tradition. Defendant Roger Huddleston was the president of the Honor the Chief Society on February 28, 2004, the date of the incident giving rise to this lawsuit, and he is pro-Chief.   Some time in 2002, the Honor the Chief Society and Huddleston excluded a number of people, including plaintiff Cook, from attending a screening of a pro-Chief documentary.  Huddleston decided to exclude Cook and the others on the recommendation of hired security guards and because the

individuals had been protesting.  Huddleston had also seen Cook protesting at sporting events and Board of Trustee meetings, and the two had called in to local radio shows at the same time to discuss each other's viewpoints regarding the Chief.

Phil Katsinas is the general manager of the Round Barn Restaurant, and also manages the Round Barn Banquet Center, which is a division of the Restaurant.  Katsinas was aware that the Honor the Chief Society was a pro-Chief group when it booked the Banquet Center for its February 28, 2004, event.

### III.   The Banquet

The Honor the Chief Society planned the February 28 banquet to honor the student who was the outgoing Chief Illiniwek, to show a pro-Chief DVD, and to generally gather membership.  The event was advertised in local papers and radio broadcasts.  Advertisements described the event as not limited to Honor the Chief Society members and open to the public, but also as a pro-Chief event.  Katsinas and the Restaurant did not have input into any of the advertisements.  Tickets were sold in the lobby of the Restaurant building, apparently by an Honor the Chief Society member.

Cook and Wegeng heard about the event through the local media.  Cook invited Wegeng, Leonard, and Fontana to come to the banquet, and Fontana in turn invited Delso.  All of the Plaintiffs were aware that the banquet was a pro-Chief event.

The banquet was scheduled to begin around 5:00 p.m., with the first hour slated for a cocktails and hors d'oeuvres social hour.  All of the plaintiffs arrived before the cocktail hour but specifically decided not to attend that portion of the event because they did not wish to socialize with the attendees and acknowledged that there may have been some disruption if they had gone. Instead, the group convened outside, near a cigar shop on the other side of the Restaurant's

1:05-cv-01069-MMM-BGC   # 130   Page 7 of 26

parking lot.  Plaintiffs were the only people standing outside the building before and during the banquet.  Some time before the entire group had arrived, Leonard entered the Banquet Center alone and purchased five tickets.  Leonard alleges that Katsinas ran into him as he was about to purchase the tickets and asked "if he was sure" that he wanted to buy some, but did not stop Leonard from doing so.

Between 4:30 and 5:00 p.m., Katsinas became aware that Cook and the other plaintiffs were gathered outside.  Katsinas recognized Cook from pictures in the newspaper.  He had read stories about Cook and heard him on the local radio, and was aware of the 2002 incident of resisting arrest after causing a serious disturbance at the women's basketball game.  Katsinas did not know any of the other Plaintiffs, but "kept an eye on" Cook and the others outside the Banquet Center.  Jim Evans, the owner of the cigar shop outside of which the Plaintiffs had convened, testified that the Plaintiffs were "hollering and carrying on," using foul language and generally talking about racism.  He also testified that they appeared agitated and out of place.

Nearly all of the banquet's 400 or so attendees were wearing orange and blue.  The Plaintiffs' attire did not fit in: Cook wore mostly black; Leonard wore a suit and boots; Delso wore bib overalls and a t-shirt; Wegeng wore jeans and a black jacket; and Fontana wore a grey blazer and jeans.  While some of the Plaintiffs wore chokers or had their hair in braids, each acknowledged that there was nothing about the way they dressed, including their jewelry, which showed them to be Native American and that non-Native Americans dressed the same way as well.

Katsinas found it odd that the Plaintiffs were milling around outside the building instead of coming in.  Katsinas' concern that the Plaintiffs would cause a disruption escalated when John

Gadau, one of the banquet attendees, told Katsinas that when he (Gadau) was outside smoking, he had overheard one of Plaintiffs tell Cook, "You go in first. You are better prepared."

Some time between an hour to a half hour before the Plaintiffs tried to enter, Katsinas approached Huddleston to tell him about the Plaintiffs and their probable plan to enter the banquet. Katsinas described the Plaintiffs as protestors and informed Huddleston that William Cook was one of the group members. Katsinas testified that he recommended to Huddleston that Cook not be allowed to enter because he felt that there would be safety issues, especially because many of the banquet attendees were elderly. Huddleston was familiar with Cook and told Katsinas that he had encountered disruptions by anti-Chief protesters in the past. Huddleston gave Katsinas permission to exclude Cook if Katsinas did not think Cook should be allowed in. During the conversation, Katsinas made no mention of the protesters' ethnicity, Native American or otherwise. Ultimately, Katsinas made the final decision to exclude the Plaintiffs, and has stated he did so because he believed they might pose a life safety issue.

Based on the parties' descriptions, the sequence of events of the Plaintiffs' attempt to enter was somewhat chaotic. The entrance to the Banquet Center consists of a first set of doors that open into a vestibule, and then a second set of doors that open into a lobby. There is another set of interior doors that open into in the actual banquet room. As the Plaintiffs started to approach the building, Katsinas called 911 and told the dispatcher that William Cook, the individual who was arrested at the basketball game in 2002, was outside and that he felt Cook was trying to enter the event and was afraid there would be a problem. Katsinas stationed himself completely outside the first set of doors. As the plaintiffs approached, Leonard was in the front of the group, then Wegeng, then Delso, and then Fontana. Cook was toward the side of the group, apparently to hold the doors open.

When Leonard first spoke to Katsinas, they were both completely outside both sets of doors. Katsinas said, "You're not coming in." A banquet attendee bystander testified that Katsinas told them that this was not the place for a protest. In response, Leonard asked him to repeat it and Katsinas said, "You're not coming in." Leonard testified that at that point, Katsinas started to retreat into the building, through the first and second sets of doors. Leonard followed him, but stopped in the vestibule, outside the second set of doors. At this point Leonard allegedly asked, "Are you not letting us in because we are Indian?" According to Leonard, who was closest to Katsinas, Katsinas allegedly replied, "Yes, you are not coming in," and went back into the building. While Leonard and Cook testified that Katsinas was on the phone at the time Leonard asked this question, Delso testified that Katsinas had put the phone down by then. Leonard testified that he tried to follow Katsinas into the building, but an unidentified man blocked the doorway and told the Plaintiffs, "You're not coming in." While the unidentified man was blocking the doorway and Katsinas was inside the building, Leonard allegedly asked one more time, "Are you denying us entry?" and Katsinas replied, "You are not coming in."

The other Plaintiffs' versions of events vary only slightly. Cook remembers that Leonard asked Katsinas, "So you're not letting us in?" approximately four times. Cook testified that one of the times, Katsinas responded, "you're just here to protest." Cook and Leonard then explained that they were not there to protest, but rather just to get the pro-Chief side of the story. Cook alleges that Katsinas responded, "Bullshit." Cook testified that Katsinas responded to some, but not all, of Leonard's repeated questioning with the answer, "Yes." Cook alleged that one of the multiple times Leonard asked "So you're not letting us in?" he altered the question by stating, "You're not letting us in because we are Indian?" Both Cook and Delso testified that Katsinas'

response was "Yes," however, Cook is not sure of the exact sequence of any questions or responses.

Wegeng denied that Leonard ever asked "are you denying use entry because we are Native Americans?"  Fontana testified that Katsinas just turned and did not respond in any way when Leonard asked if they were being denied entry because of their race.  Fontana also testified that he heard Katsinas urgently yelling into the phone, "They're coming in.  They're coming in.  Hurry."

None of the Plaintiffs told Katsinas that they were Native American.  Katsinas has testified that he denied them entry because he felt Cook's presence would create a hostile environment and was worried about the patrons inside.  However, Katsinas also testified that he does not recall the exact conversation he had at the door with the Plaintiffs.

The group left the vestibule and went outside on the sidewalk.  The police arrived shortly afterward.  The only reason Katsinas offered to the police for wanting them kept out of the banquet was that he was afraid of disruption.  The Plaintiffs gave their version of events, and Leonard told the police that their civil rights were being violated.  The police told the Plaintiffs that they had to leave the establishment, but that they could stay in the parking lot or surrounding areas, and the Honor the Chief Society gave Leonard a full refund for the tickets he had purchased.

On March 1, 2004, Leonard appeared on WICD TV for an interview regarding the incident at the Restaurant.  Cook, Fontana, and Wegeng also attended the interview.  While all four were prepared to be interviewed, the reporter covering the story, Jim Needleman, informed the four Plaintiffs that only one of them needed to speak during the interview, and the four agreed that Leonard should be the one to talk.  During the interview, Leonard stated that the

group was denied entrance to the banquet because they are Native American.  In their depositions, Cook, Fontana, and Wegeng each testified that they agreed with Leonard's statements on TV, and Leonard testified that he believed he was speaking as the group's "spokesman."

Also after the incident, Fontana began circulating an email to multiple local newspapers and television stations alleging that he was denied access to the Restaurant because of his race. Plaintiffs also made allegations against Round Barn employees and the Honor the Chief Society, claiming that they were kept out because they were Native American.  Defendants assert that Katsinas' reputation has been damaged by these statements and that the Round Barn Banquet Center has and will lose business as result of Plaintiffs' reports to the media.

Plaintiffs filed this action on February 28, 2005, against Roger Huddleston, the Honor the Chief Society, the Round Barn Restaurant, and Phil Katsinas, alleging that the Defendants had deprived them of their rights secured by 42 U.S.C. § 1981.  On April 11, 2005, Defendants Phil Katsinas and Round Barn Restaurant filed a Counterclaim against all five Plaintiffs for defamation.  On August 8, 2005, Defendants Katsinas and Round Barn Restaurant amended their Counterclaim to include a count for conspiracy to commit defamation.  On November 6, 2006, Defendants Huddleston and Honor the Chief Society filed separate Motions for Summary Judgment.  Also on November 6, Defendants Katsinas and Round Barn Restaurant filed a joint Motion for Summary Judgment.  Plaintiff conceded that Summary Judgment in favor of Huddleston and Honor the Chief Society was appropriate, and the Court dismissed those Defendants pursuant to a joint stipulation submitted by the parties.  Katsinas and Round Barn Restaurant are the only remaining Defendants.  Their Motion for Summary Judgment is fully briefed, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. In other words, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

### I.  Plaintiff's Claims under 42 U.S.C. § 1981

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.  Under this section, the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."  *Id*. § 1981(b). Typically, plaintiffs invoke § 1981 to assert their rights to be free from discrimination while making and enforcing employment contracts.  *Pourghoraishi v. Flying J. Inc*., 449 F.3d 751, 756 (7th Cir. 2006).  However, courts have also addressed § 1981 claims made by plaintiffs who allege that they faced illegal discrimination in retail establishments or were denied the right to contract for food and beverages in restaurants.  *See, e.g*., *id*.; *Morris v. Office Max, Inc*., 89 F.3d 411 (7th Cir. 1996); *Lizardo v. Denny's, Inc*., 270 F.3d 94 (2d Cir.  2001); *O'Neill v. Gourmet Systems of Minnesota, Inc*., 213 F. Supp. 1012 (W.D. Wis. 2002).

To establish a claim for of such discrimination, a plaintiff must show that "(1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi*, 449 F.3d at 756.  While Defendants concede that Plaintiffs have satisfied the third prong, they argue that Plaintiffs' claim must fail for several reasons.

### A.  Equal Benefits Clause of § 1981

By incorporating a section of the Motion for Summary Judgment brought by the Honor the Chief Society, Defendants argue that Plaintiffs' claim is not actionable under the "equal benefits clause" of § 1981(a).  Section 1981(a) provides, in its entirety, that

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

Courts have regularly divided their analysis of § 1981(a) into a "make and enforce contracts" clause and an "equal benefits clause," each clause securing different rights. *See, e.g.*, *Adams ex rel. Harris v. Boy Scouts of America-Chickasaw Council*, 271 F.3d 769 (8th Cir. 2001); *Sheppard v. Dickstein, Shaprio, Morin & Oshinsky*, 59 F. Supp. 2d 27 (D.D.C. 1999).

Defendants argue, in essence, that (1) Plaintiff's complaint quotes only the equal benefits clause of § 1981 and should therefore be construed as attempting to state a claim under only that clause, and (2) this lone claim must fail because neither Plaintiffs' security nor their property was threatened in this case.

The Court does not agree that Plaintiffs' Complaint is brought exclusively under the ambit of equal benefits clause of § 1981(a).  While the Complaint does quote the equal benefits clause, it also generally invokes the whole section, and is to be construed liberally under the pleading standards of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 8(a).  Defendants were surely on sufficient notice that Plaintiffs could be stating a claim under the contracts clause of § 1981, which unlike the equal benefits clause, contains no explicit limitation that their security or property be threatened.  Because the Court does not adopt portion (1) of this argument, it need not delve into portion (2).  Defendants' Motion for Summary Judgment on this ground is denied.

14

**B. The First Prong: Protected Class**

Defendants argue that Plaintiffs' § 1981 claim must fail because they are not all members of a protected class, that is, they are not all racially Native American. While Defendants concede that Tom Leonard has provided "sufficient documentation" of his Native American ancestry, they refute that the other four Plaintiffs' speculations regarding their lineage meets their burden in order to survive Summary Judgment. Defendants have not directed the Court to any authority defining a quantum of Native American blood required to satisfy this first prong, yet they insist Plaintiffs Cook, Delso, Wegeng, and Fontana cannot establish that they have enough. Moreover, Defendants argue that Katsinas did not believe the Plaintiffs were anything but white, and that belief was reasonable based on the Plaintiffs' appearances.

In response to Defendants' position that Cook, Delso, Wegeng and Fontana cannot establish that they are racially Native American, Plaintiffs cite only the portions of their own deposition testimony in which they describe their Native American ancestry, and draw the quick conclusion that "[a]ll plaintiffs therefore satisfy the first prong of the *Pourghoraishi* test – Native American ancestry." Pl.'s Resp., at 12. Plaintiffs' also refute Defendants' assertion that Katsinas did not believe the Plaintiffs' were anything but white, insisting that Katsinas "apparently knew [the plaintiffs] to be Indians," as he did admit that he was barring them from the Restaurant because of that reason. Pl.'s Resp., at 4-5.

Native Americans are a well-recognized protected class, and their claims under the various anti-discrimination statutes have been treated as both race and national origin claims. *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 154 F.3d 1117, 1119 n.4 (9th Cir. 1998). Section 1981 applies to claims of discrimination based on race but not national origin. *Pourghorasishi*, 449 F.3d at 756. However, the Supreme Court and Seventh Circuit have

defined race broadly to include those who are subjected to intentional discrimination "because of their ancestry or ethnic characteristics," *id*. (citing *Saint Francis College v. Al-Khazaji*, 481 U.S. 604, 609 (1987)), thereby arguably rendering irrelevant, for practical purposes, most distinctions between the race and national origin claims. *See* Wayne N. Outten & Kathleen Peratis, *National Origin Discrimination*, 676 PLI Litig. and Admin. Practice Course Handbook 291, 296-97 (June 2002) ("We see race/ethnicity/national origin as more of continuum than as mutually exclusive categories. In the last two decades, the notions of 'race' and 'national origin' have become intertwined nearly to the point of merger."). While a plaintiff's membership in a protected class is a typically conceded element of a discrimination cause of action, it is not uncommon for a defendant to challenge whether a plaintiff's race or nation of origin qualifies for protection. *See*, *e.g.*, *Pourghoraishi*, 449 F.3d at 756-57 (confronting whether person of Iranian ancestry belongs to a distinct race protected by the discrimination prohibition of § 1981). Considerably more rare, however, are cases that confront a defendant's argument that, while the plaintiff's purported race deserves protection, the plaintiff has not sufficiently proven that he or she actually is a member of that protected race. Neither Plaintiffs nor Defendants have directed the Court to any controlling case law on point.

Resolution of Defendants' argument poses a special challenge, because on the one hand, Seventh Circuit cases indicate that the first thing a plaintiff must establish in order to have a viable § 1981 claim is membership within a protected class. *E.g.*, *Pourghoraishi*, 449 F.3d at 756; *Morris v. Office Max, Inc*., 89 F.3d 411, 413 (7th Cir. 1996). On the other hand, if there is evidence that an alleged discriminator believed the plaintiffs to be a members of a member class—in this case, Native Americans—and discriminated against them based on this belief, should it even matter if the plaintiffs are actually members of that protected class or not? Anti-

discrimination statutes like § 1981 were undoubtedly drafted to curb certain actions grounded in racial animus, and prohibited racial animus should arguably be no less actionable if carried out in a case of mistaken identity.  Furthermore, the Court is fully aware that race is a knotty concept that has evolved over time and that most agree is not biological in nature.  *See Saint Francis Coll.*, 481 U.S. at 610, 610 n.4 (detailing the evolution of the common understating of race and noting that most scientists "conclude that racial classifications are for the most sociopolitical, rather than biological, in nature"); Lisa K. Pomery, *Restructuring Statistical Policy Directive No. 15: Controversy Over Race Categorization and the 2000 Census*, 32 U. TOL. L.REV. 67, 69 ("[R]ace is not genetic in nature, and there is more human variation within race-based groups than between them.  This has led some experts to conclude that racial categorization results from human interaction rather than genetic variation.").

In some cases, a plaintiff's similar claims under other discrimination statutes have hinged on the defendant's perceptions.  Arising in the context of a 42 U.S.C. § 1983 racial discrimination claim, the case of *Estate of Amos v. City of Page, Arizona*, 257 F.3d 1086 (9th Cir. 2001), is instructive.  There, the trustee of a decedent's estate brought an action against the City of Page after the decedent fled the scene of a car crash, the City police called off a search party, and the decedent was later discovered dead in the nearby desert.  The trustee argued that the City violated the Equal Protection Clause when it selectively withheld protective services from the decedent because they believed he was Native American.  *Id*. at 1092-93.  The trustee's complaint alleged that it was the City's standard practice not to search for runaway drivers because the City believed that most runaway drivers are Native Americans "who bolt to the Navajo Reservation after an accident and call the police shortly thereafter, reporting their cars as stolen."  *Id*. at 1093.  The trustee also alleged that the City would search for runaway drivers who

17

were believed to be white.  *Id*.  The trustee contended that the decedent, who was actually white, was the victim of this discriminatory policy because the police officers mistakenly believed that the decedent was Native American, and thus, cut short their search efforts.  *Id*.  The City argued that the trustee lacked standing to bring the suit for a variety of reasons, including that the suit could not be maintained because the decedent was actually white and not Native American.  The Ninth Circuit rejected this argument, stating,

> [The trustee] alleges that [the decedent] was the target of discrimination based upon mistaken racial identity.  That [the decedent] was actually white does not make that discrimination or its resulting injury any less direct.  Thus, for purposes of standing, [the decedent] should be viewed as the trustee alleges the police officers viewed him: as a Native American.  The City's alleged discrimination is no less malevolent because it was based upon an erroneous assumption.

*Id*. at 1094.

More analogous to the facts (and procedural posture) currently before the Court is the case of *Perkins v. Lake County Department of Utilities*, 860 F. Supp. 1262 (N.D. Ohio 1994), where the Ohio district court found blood quantum levels to be irrelevant to a discrimination claim because racial discrimination results from the discriminator's perception of plaintiff.  In *Perkins*, the defendant employer argued at summary judgment that plaintiff's Title VII case must fail because plaintiff could not establish that he was an American Indian, and therefore was not a member of a class protected by Title VII.  *Id*. at 1264-65.  As proof of this contention that the plaintiff was not a member of the protected class of Native Americans, the defendant submitted a lengthy, detailed affidavit of an expert in the field of tracing family ancestry and race.  The expert stated that she performed exhaustive research of a variety of sources that retain Native American census information in addition to the plaintiff's own family tree and that these extensive searches did not reveal that the plaintiff had any perceptible degree of Indian Blood or

that he was anything but white.  *Id*. at 1266-68.  The plaintiff insisted he was an American Indian, that his parents had always told him of his Indian heritage, and they had acknowledged their Native American heritage all their lives.  *Id*. at 1269.  It was undisputed by the defendant that, without regard to whether the plaintiff was or was not demonstrably an American Indian, the plaintiff held himself out to be such, and the defendant considered him to be such, at least until the start of the litigation.  *Id*. at 1270.

As it set out to address the issue of categorizing an individual within a particular race, the court noted that "[a]s far as designation of individuals as Native Americans is concerned, there is no hard and fast rule."  *Id*. at 1273.  The court noted it was without the benefit of any case law in which an individual's status as Native American was challenged within the context of a statute prohibiting racial discrimination, *id*. at 1274, and declined to adopt previous judicial or Congressional definitions of "Indian" that were formulated for purposes of "entitlement" statutes that accord American Indians special privileges.  *Id*. at 1275-76 (*citing, e.g*., *Witt v. United States*, 681 F.2d 1144 (9th Cir. 1982) (Congressional determination of who may be designated an "Indian" or a "non-Indian" for purposes of distribution of government lands to Indian tribes under the Indian General Allotment Act, 25 U.S.C. § 3344) and *United States v. State of Washington*, 476 F. Supp. 1101 (Wash. 1979) ("Indian" defined for purposes of entitlement to fishing rights under treaties)).  The court recognized a fundamental difference between Native American "entitlement" legislation and anti-discrimination legislation:

> Indian legislation dissimilates, rather than assimilates, and, therefore, it is necessary to objectively define what individual or tribe falls under the auspices of any such particular law.  Title VII has an entirely different purpose.  Title VII does not single out Indians for special benefits or treatment, but, rather, attempts to equalize the position of all employees, be they Native American, African-American, Hispanic, Asian or white.  The statute addresses perceived different which do not have a basis in fact between races and ethnic groups.

*Id*. at 1276.

Because Title VII "is in force to equalize," the court found that membership in a given protected class carried a lower threshold of proof than would be the case under entitlement legislation. On the one hand, the defendants put forward evidence that the plaintiff was, at most, 1/16[th] Native American, while the plaintiff considered himself to be Native American and had represented himself as such, and furthermore, the defendants believed him to be an Indian. *Id*. Mindful of the purposes behind Title VII, the court found the key consideration to be the perception of alleged discriminator:

> In the opinion of this Court, it is the employer's reasonable belief that a given employee is a member of a protected class that controls the issue. This Court believes that, consistent with the intent to Title VII, when racial discrimination is involved, perception and appearance are everything. As with the joy of beauty, the ugliness of bias can be in the eye of the beholder.
> So long as there is some objective evidence reflective of a basis for an employer's belief as regards an employee's Indian lineage this Court does not believe that it is necessary to resolve whether the employee is one percent Native American or one hundred percent Native American. . . .
> In the opinion of this Court this conclusion logically follows by the combined factors of racial ambiguity in today's heterogeneous society, Title VII's attempt to equalize the footing of all employees without regard to the employer's subjective perceptions and preconceived ideas, and the difficulty, perhaps even the impossibility with Native Americans, of establishing unquestionable genetic/hereditary classification.

*Id*. at 1277.

Here, as was the case in *Perkins*, this Court is confronted with an anti-discrimination issue that would better be resolved by Congress. After all, when Congress passed the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., it explicitly extended protection to not just those individuals who were actually disabled, but also to individuals "regarded as" disabled by their employers—in other words, individuals who are discriminated against based solely on misperception. *See* 42 U.S.C. § 1201(2)(C) ("The term 'disability' means, with respect to an

individual . . . (C) being regarded as having such impairment"). Providing protection to even those who are erroneously identified as disabled was apparently necessary, in Congress' vision, to achieve the ADA's stated purpose of "[providing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" *Id.* § 1201(b)(1).

It would obviously be preferable if there were a clear statutory mandate on point. Still, the Court must resolve the instant dispute. And, it strives to do so in a manner faithful to both legal precedent interpreting § 1981, which has long extended protection to individuals who fall outside of technical categories of racial minorities, *see, e.g.*, *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 820-22 (7th Cir. 2006) (describing modification of a traditional §1981 prima facie case, which "is not inflexible," in situation of reverse discrimination against whites), and to the overall scheme of the anti-discrimination statutes.

For purposes of resolving the instant dispute, this Court adopts, in large part, the prudent reasoning of the *Perkins* decision, that in light of the purposes of anti-discrimination statutes, including § 1981, a focus on the perceptions of the alleged discriminator is appropriate at this stage. It is not necessary to determine whether Cook, Delso, Wegeng, and Fontana are "one percent Native American or one hundred percent Native American," at this point so long as "there is some objective evidence reflective of a basis for" Katsinas' purported belief that the Plaintiffs' are Native American. 860 F. Supp. at 1278. "That objective basis may consist of physical appearance, language, cultural activities, or associations" so long as any or all of those objective factors led Katsinas to believe that the Plaintiffs were Native Americans, and dealt with them on that basis. *Id.*

Katsinas and the Restaurant have put forward evidence that Katsinas had no idea that the Plaintiffs were Native American. Plaintiffs, who were gathered in protest of Chief Illiniwek, rely on Katsinas' (alleged) admission that he was barring them from the Restaurant because they are Native American. That admission in context, if believed as genuine by the jury, would certainly be evidence that Katsinas believed the Plaintiffs to be Native American. Additionally, each of the Plaintiffs' testified under oath regarding their Native American ties. Because the existing factual disputes, Plaintiffs' claim shall survive Defendants' Motion for Summary Judgment on this point.

However, the Court is mindful that, unlike with the ADA, there is no express protection in § 1981, or Title VII for that matter, for individuals "regarded as" members of a protected class. That Congress has not elected not amend Title VII or § 1981 to correspondingly widen the scope of statutory protection is some suggestion that it regards actual membership within a protected class a mandatory requirement to prevail under those statutes. Accordingly, Plaintiffs will bear the burden of proving at trial, through competent evidence, that they are members of the protected class. Whether or not Cook, Delso, Wegeng and Fontana are actually of Native American ancestry is a dispute of material fact which must be resolved by a jury, and it must resolved in Plaintiffs' favor before they can survive a motion for directed verdict at the close of their case or ultimately prevail on their claims under § 1981.

### C. The Second Prong: Intentional Discrimination

Defendants argue that Plaintiffs have failed to establish the second and most critical element of their claim: intentional discrimination. "A plaintiff bringing suit under section 1981 . . . can meet his burden of proof for establishing intentional discrimination either through direct proof of discriminatory intent, or through the indirect, burden-shifting method of proof first

elaborated in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)." *Von Zuckerstein v. Argonne Nat'l Laboratory*, 984 F.2d 1467, 1462 (7th Cir. 1993) (internal citations omitted); *see also Paul v. Theda Medical Center, Inc.*, 465 F.3d 790 (7th Cir. 2006) (applying the burden-shifting framework in a § 1981 case).

Direct evidence of intentional discrimination does not rely upon inference or presumption. The classic example of direct evidence would be a decision-maker's admission that an adverse action was taken against the plaintiff based solely on an impermissible ground, such as race. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). Such an admission is exactly the type of evidence put forth by the Plaintiffs.

According to the deposition testimony of Leonard, Cook, and Delso, Leonard asked Katsinas if the Plaintiffs were being barred from the Restaurant because the group was Native American, and Katsinas responded affirmatively. Katsinas does not remember the details of this exchange with Leonard but insists that he did not even think that the Plaintiffs were Native American, let alone did he exclude them for that reason; rather, it is Katsinas' testimony that the only reason he barred the Plaintiffs was because he was concerned that their presence would pose a safety issue to the banquet attendees. This competing evidence presents a factual dispute regarding intentional discrimination, plain and simple. The Court does acknowledge that the Defendants have put forth extensive evidence that Katsinas' purported belief that the Defendants could cause a potentially dangerous disruption was a reasonable one, that Katsinas did not even know the Plaintiffs' race, and that Katsinas did not make the admission in question, or that if he did, it was an "innocent mistake" because Katsinas was panicked and distracted at the time of the exchange. However, to believe Defendants' evidence, and to disregard Plaintiffs' direct evidence would amount to assessing credibility and weighing evidence, functions reserved for

the jury in this case and inappropriate for the Court at the Summary Judgment stage.  Moreover,

despite Defendants' insistence to the contrary, the evidence is not so "one-sided" that no

reasonable jury could find for the Plaintiffs.

Defendants also argue that even if the Plaintiffs' testimony might establish some direct

evidence of discrimination, the court should construe the statement as inadmissible hearsay and

therefore not consider it.  Federal Rule of Evidence 801(d)(2) designates as nonhearsay

admissions by party-opponents, including "a statement of which the party has manifested an

adoption of belief in its truth," generally referred to as an "adoptive admission."  Fed. R. Ev.

801(d)(2)(B).  Defendants rely on a Fourth Circuit case for the proposition that Katsinas'

affirmative response is not sufficiently reliable to be admitted into evidence:

> [W]hen a statement is offered as an adoptive admission, the primary inquiry is
> whether the statement was such that, under the circumstances, an innocent
> defendant would normally be induced to respond, and whether there are sufficient
> foundations facts from which the jury could infer that the defendant heard,
> understood, and acquiesced in the statement.

*Carr v. Deeds*, 453 F.3d 593, 607 (4th Cir. 2006); *see also Muley v. Carlson*, 125 F. Supp. 2d

1117, 1120 (N.D. Ill. 2000) ("Before admitting a statement as an adoptive admission, I 'must

first find that sufficient foundational facts have been have been introduced for the jury

reasonably to conclude that the defendant did actually hear, understand and accede to the

statement.'").

Here, Katsinas' alleged response of "Yes"  or "Yes, you're not coming in" to the question

"Are you not letting us because we are Indians?" is unlike the more tenuous situation where a

party seeks to admit an opposing party's silence as acquiescence to and adoption of a particular

statement.  While there is evidence that the exchange was hurried and Katsinas may not have

fully comprehended what he was affirming, the alleged fact that he did audibly respond to the

question is evidence from which a jury could reasonably conclude that the defendant did hear and understand that question.  With all due respect, this hearsay argument is without merit and Katsinas' response shall be considered as evidence.

Defendants also argue that Plaintiffs cannot prove intentional discrimination by the indirect method.  Defendants correctly point out that it is not perfectly clear, under Seventh Circuit precedent, what elements Plaintiffs would have to establish in order to make out a prima facie case of intentional discrimination in the retail/restaurant setting.  *Compare Pourghoraishi*, 449 F.3d 751 (referring to the three-part standard above the "prima facie claim" of discrimination under § 1981 but never reaching the issue of direct versus indirect methods of proof) *with O'Neill v. Gourmet Systems of Minnesota*, 213 F. Supp.2d 1012 (W.D. Wis. 2002) (interpreting the three-part standard above as the *general* elements of a § 1981 claim, not the elements of a prima facie case as understood in the burden-shifting framework, and relying on 4th and 6th Circuit precedent in applying the following four factors as establishing a prima facie case of discrimination in the retail or commercial context: "(1) the plaintiff is a member of a protected class; (2) the plaintiff made himself available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) the plaintiff did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) the plaintiff was deprived of services while similarly situation persons outside the protected class were not deprived of those services, and/or (b) the plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable").  However, Plaintiffs' briefing makes clear that the only evidence of intentional discrimination on which they rely is the purported admission of Katsinas.  As the

Court mentioned above, this type of evidence is quintessential direct evidence.  Because

Plaintiffs have succeeded, at the summary judgment stage, on the direct method of proving

discrimination, and have not apparently attempted to proceed with the indirect method, the Court

will not proceed to address Defendants' arguments on this point.

## II.   Defendants' Counterclaims for Defamation and Conspiracy to Commit Defamation

Defendants also argue that they are entitled to Summary Judgment on their counterclaims

for defamation and conspiracy to commit defamation.  "To prove a claim of defamation, a

plaintiff must show that a defendant made a false statement concerning the plaintiff, that there

was an unprivileged publication of the defamatory statement to a third party by the defendant,

and the plaintiff was damaged."  *Global Relief Foundation, Inc*., 390 F.3d 973, 981 (7th Cir.

2004).  The threshold element that the Counter-Plaintiffs/Defendants must prove is that the

Counter-Defendants/Plaintiffs made a false statement.  As explained above, the Court cannot

find, as a matter of law, that the purportedly defamatory statements in this case—essentially, that

Katsinas and the Restaurant barred the Plaintiffs because they are Native Americans—were

false. Accordingly, the Counter-Plaintiffs'/Defendants' Motion for Summary Judgment on the

defamation counts is denied.

## CONCLUSION

For the reasons set forth above, Defendant Kastinas and Round Barn Restaurant's Motion

for Summary Judgment is DENIED.


ENTERED this 11th day of April, 2007.


  s/Michael M. Mihm
                     Michael M. Mihm
                     United States District Judge